J. C. KINCAID, RESPONDENT, v. A. J. ESTES, APPELLANT.[*]

Kansas City Court of Appeals. December 7, 1925.

---

[*]Corpus Juris-Cyc. References: Bills and Notes, 8CJ, section 1292, p. 984, n. 60; section 1376, p. 1061, n. 61; section 1378, p. 1064, n. 81; section 1385, p. 1066, n. 20.

*Meriwether & Meriwether, McBaine & Clark* and *Paul M. Peterson* for respondent.

*R. M. Bagby* and *North T. Gentry* for appellant.

BLAND, J.—This is a suit upon a promissory note in the sum of $2000, executed by the defendant as maker on November 1, 1921, due twelve months after date and made payable to H. L. Yeager. Plaintiff claims to be owner of the note by endorsement. At the conclusion of all the testimony the court gave plaintiff's peremptory instruction to find for him, resulting in a verdict and judgment in favor of plaintiff in the sum of $2454.90 and $245 attorney's fees, and defendant has appealed.

This is the second appeal in the case (see Kincaid v. Estes, 262 S. W. 399, where the principal facts are stated). The defenses at the second trial were the same as those at the first. At the second trial the following additional evidence not appearing in the first one was brought out: The witness Smith, cashier of the Exchange Bank at Columbia, Missouri, testified that when plaintiff came to see him at Columbia in the latter part of 1921 plaintiff stated that he held a note against defendant and inquired of the witness the financial standing of the defendant; that he wanted to sell the witness the note in question; that the witness asked him what was the note given for and plaintiff replied he "didn't remember, didn't know;" that he told plaintiff that "before I would negotiate for the note at all I would have to find out from Mr. Estes what the note was for, and so forth, and if it was a valid note, I might talk to him. Q. Did he wait? A. No, he left." Defendant officed in the same building with Smith.

Witness Bright, testifying for defendant, stated that he was president of the Boone County Trust Company, located in Columbia, and that in December, 1921, plaintiff came to him and offered to sell him defendant's note; that—

". . . in short, he wanted to know Mr. Estes' financial and moral standing, and I told him it was very high morally and financially, that he stood as well as any man in Boone county. He wanted to sell this note to me and make a considerable discount—I forgot how much—and I told him that I never bought a note without consulting the man that gave it first, that I would have to see Estes; and the conversation ended very abruptly when I told him I would have to see Estes first."

On cross-examination the witness stated that plaintiff told him that "he had a note on Mr. A. J. Estes for $2000, and was asking me his financial standing." That he offered to sell the note to witness saying, "he would make a good, liberal discount; the amount he agreed to take for it aroused my suspicion—something was crooked about it." Plaintiff testified that he did not know Bright; that at the time in question he visited banks other than Smith's but that he did not know which one it was and did not remember any conversation except with Smith and did not remember trying to sell the note to Smith.

Defendant testified that plaintiff came to see him the latter part of December, his recollection being that it was Christmas week, 1922,

about collecting the note; that at that time plaintiff told him "he had just got" the note. The witness George testified that in the year 1921 Yeager attempted to trade the note in controversy for a Chevrolet car, the price of which was $595, this occurred in Monroe City; that he called up Estes over the telephone in reference to it and after talking to him decided that he did not want the note. Afterwards plaintiff came to see him and asked him "a few questions about the note and what I thought about it." The witness told him about the transaction in reference to the car and about the witness's investigation but the witness thought that at the time plaintiff called on him the plaintiff had already purchased the note. The time of the conversation had between plaintiff and this witness is not given.

It is insisted by the defendant that the court erred in directing a verdict for plaintiff. Plaintiff claims that it is disclosed in the opinion in the former appeal that this court believed that plaintiff's instruction for a direct verdict should have been given, but held that plaintiff was estopped from making the point for the reason that he gave instructions submitting the various issues to the jury. The point was made in that appeal that plaintiff's instruction should have been given and we did hold that he was estopped from so claiming for the reason that is now suggested by plaintiff, but we did not hold that plaintiff was entitled to have the peremptory instruction given had he not offered the other instructions. It was unnecessary for us to pass on that point and it would have been unusual, to say the least, for us to have done so in view of the fact that we held that plaintiff was entitled to have given the peremptory instruction on the facts then presented. In addition to this, there are other facts disclosed in the second appeal which now make the case much stronger against plaintiff's contention.

Defendant insists that there was evidence from which the jury could say that plaintiff was not an innocent purchaser. It is unnecessary for us to restate the facts contained in our former opinion but reference thereto, together with such additional facts as are stated herein, will give a history of the transactions. The law governing the case may be stated as follows: Defendant having shown fraud in the procurement of the note, the burden was upon plaintiff to show that he was a holder in due course. [Section 834, R. S. 1919.] Section 838, R. S. 1919, provides as follows:

"A holder in due course is a holder who has taken the instrument under the following conditions: (1) That it is complete and regular upon its face; (2) that he became the holder of it before it was over-due, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

We said in the former appeal—

". . . this burden is on the holder to prove his good faith and lack of notice of fraud when fraud has been shown in the procuring of the note. If the holder shows this, then the burden is upon the defendant to prove specific facts tending to show plaintiff's actual knowledge of the defect in the title or his bad faith. In case of defendant's failing to offer any evidence to that effect, plaintiff is entitled to a directed verdict. [Downs v. Horton, 230 S. W. 103, and cases therein cited.] Mere suspicious facts, or facts that would put a reasonable man on inquiry, or negligence, is not sufficient to charge a purchaser of a note with notice of the fraud. Actual notice of the facts concerning the execution must be brought home to the holder. Nothing short of actual knowledge or bad faith will defeat the holder's title. [Downs v. Horton, supra, loc. cit. 106, and cases cited.] However, such actual knowledge may be inferred from the facts and circumstances surrounding the purchase of the note by the holder, but such facts and circumstances cannot be inferred from things that would merely put a prudent man on inquiry." [Bank of Hale v. Linneman, 235 S. W. 178, 181.]

It was stated in DePres, Bridges & Noel v. Galloway, 224 S. W. 998, 1000—

"When plaintiff's evidence discloses all the facts and shows all the elements constituting him a holder in due course, disclosing no *damaging or impeaching facts and is uncontradicted,* then he is entitled to recover." [See, also, Downs v. Horton, 287 Mo. 414, 426; Investment Co. v. Bruce, 132 Mo. App. 257, 263.]

It is insisted that damaging or impeaching circumstances are disclosed and that plaintiff's evidence is contradicted, therefore the question of good faith was one for the jury. We think there is merit in this contention. There was evidence tending to show that Yeager was a man of no means; that "he was not worth anything." Plaintiff testified that when he lent Yeager money that he knew that "Yeager was hard up" and that some days Yeager "didn't have anything." Of course, plaintiff's version of how he lent Yeager money shows that Yeager was a man in need of funds. Plaintiff admitted that although he asked Yeager whether the note was secured by a deed of trust or chattel mortgage, he did not ask him what the note was for and he testified that as far as he knew it might have been stolen. He attempted to sell the note to Smith and Bright at a time when he had no right to sell it, it being claimed that he held it merely as collateral security for loans until March 18, 1922. He had no right to sell the note until that time under his own testimony. There is no evidence or suggestion anywhere that Yeager gave plaintiff permission to sell the note, so there was evidence for the consideration of the jury, tending to show that plaintiff was attempting to sell a note that he had no right to sell, which would be a dishonest act and therefore tending to impeach

plaintiff. However, the jury might take still another view of it and conclude that his conduct in attempting to sell the note and his denial on the stand that he made such an effect in the case of Bright, and his failure to explain why he tried to sell it to Smith under the circumstances, and his action in attempting to sell it for such a discount as to arouse the suspicion of the banker, give rise to an inference that at that time he had already obtained the note from Yeager and was trying to sell it at a big discount on account of the circumstances under which it was obtained from defendant. Under this theory plaintiff's whole story was impeached. It will be remembered that plaintiff testified he was not acquainted with Bright and did not remember of having any conversation with him. Plaintiff also testified that he did not remember whether or not he tried to sell the note to Smith.

In this connection it should be stated that there is conflict in the testimony between plaintiff and defendant as to what occurred in the conversation had between them. Plaintiff testified that he saw defendant the first time in October and the second time in December; that plaintiff told him on one of these occasions that he took the note as collateral for a loan of $300 to Yeager; that he did not tell him that he had sold Yeager an equity in some Colorado land or that the Colorado land had cost him $1865; that defendant asked him what he paid for the note and that he probably told defendant what the note cost but did not tell him what the land cost and did not tell defendant that the land he traded the note for cost $1835 ($1865). Plaintiff admitted that he refused to sign a statement as to how he obtained the note. Defendant testified that the first time he saw plaintiff was in the latter part of December, Christmas week, 1922, and at that time he asked plaintiff how he came to buy the note and that plaintiff responded that "he had traded some equity in land;" that plaintiff came to see him twice and at the second time told him that the total cost of the land was $1865; that in the first conversation plaintiff told him that he had lent Yeager $300 on the note.

Plaintiff in his brief states that his position at the trial was—

". . . that he advanced money to Yeager upon the security of the note and later traded him an equity in lands in Elbert County, Colorado, for the balance of the note so that he paid for the note the money advanced to Yeager before Yeager left Monroe City and one-half the value of equity in lands in Elbert County, Colorado."

(The evidence shows that plaintiff owned only one-half of the equity in the Colorado land. Yeager owning the other half.) According to defendant's testimony the first time plaintiff saw him he stated to defendant that he had lent Yeager $300 on the note and had traded some equities in land for the note. The second time he told defendant that the land cost $1865. At the trial plaintiff testified that he lent Yeager a total of $765, for which Yeager gave him a note for $915

and plaintiff held the note in suit as collateral; that in the deal with Yeager in reference to the Colorado land, he received a second deed of trust in the sum of $1000 and the note in suit in exchange for his equity in the land and Yeager's note for $915. The consideration for the note, as plaintiff related it to defendant, was different; he told defendant that he had lent Yeager $300 upon the note and that he had given Yeager for the note his equity in land valued at $1865. The fact of Yeager's insolvency and plaintiff's failure to ask him concerning the consideration for the note, and plaintiff's leaving when Bright and Smith suggested seeing defendant in reference to the validity of the note, and plaintiff's failure to communicate with or see him before he bought the note in suit, standing alone might not amount to enough to deprive plaintiff of a directed verdict. But these facts together with the other facts that we have recited create a damaging situation against plaintiff's claim. While the burden was upon defendant not only to show lack of consideration but that plaintiff had knowledge of it, the whole evidence leaves this issue for the jury's consideration.

It is insisted that whether the note was endorsed to plaintiff was a question for the jury. In the former appeal we held that there was nothing to contradict plaintiff's evidence that it was so endorsed. The evidence in the second trial raises a question as to plaintiff's ownership of the note. He was exercising the rights of an absolute owner of the note in December, 1921, when it is admitted that he was not such an owner at that time. The jury could find that he was acting for Yeager. His testimony as to how he procured the note is contradicted. The answer denies that the note had been endorsed to plaintiff and we think, undoubtedly, the endorsement was a question for the jury. [Bank of Bernie v. Blades, 215 Mo. App. 459; Metropolitan Discount Co. v. Indermuehle, 272 S. W. 1037; Furth v. Cafferato, 240 S. W. 476, 477.] This, together with other evidence, tends to show that plaintiff did not acquire the note before maturity. The note was due November 1, 1922, and on Christmas week of that year he told defendant "he had just got it" when plaintiff claims that he secured it not later than March 18, 1922.

The judgment is reversed and the cause remanded. *Arnold, J.*, concurs; *Trimble, P. J.*, absent.